IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID SOLAN,                         :
                                     :
          Plaintiff                  :
                                     :
          vs.                        :     CIVIL NO. 1:CV-06-0049
                                     :
                                     :
MS. V. RANCK, nee Hursh, et al.,:
                                     :
          Defendants                 :


*M E M O R A N D U M*

I.    *Introduction.*

          The pro se plaintiff, David Solan, currently an inmate
at FCC-Peterburg, Petersburg, Virginia, filed a complaint
alleging his constitutional rights were violated while he was an
inmate at FCI-Allenwood, White Deer, Pennsylvania. He has named
the following Allenwood officials and officers as defendants:
Ms. Ranck, a counselor; Lt. Clarkson, a former lieutenant at
Allenwood; Mr. Bittenbender, the disciplinary hearing officer;
Lt. Shepard, a lieutenant at the prison; Ms. Levi, a former unit
manager; Lt. Feltman, an SIS officer; and Troy Williamson, the
former warden. Plaintiff also lists unnamed defendants.

          The complaint makes the following claims: (1) an
Eighth Amendment excessive-force claim arising from Plaintiff's
forced removal from a shower stall on June 10, 2005; (2) a
Fourth Amendment claim for being removed from the shower and
marched back to his cell while naked and shackled; (3) an equal-

protection claim alleging that the forced removal from the shower and the naked escort was because Plaintiff is an elderly, peaceful Jewish intellectual. In addition, there are five retaliation claims, all based on Plaintiff's having filed grievances about the June 10 incident and thereafter: (1) Plaintiff's transfer to USP-Canaan; (2) his placement in segregated housing on July 3, 2005; (3) his placement in a segregation cell from July 5, 2005, through July 7, 2005, with a mentally disturbed inmate who caused Plaintiff emotional suffering; (4) the refusal to return Plaintiff to the cell he occupied before July 3; (5) the attempted placement on July 7 after his return from an operation in a six-man cell with incompatible cell mates and filthy conditions and then when he refused this assignment, placement in segregated housing with a mentally disturbed cell mate in filthy conditions.

We are considering the defendants' motion for summary judgment under Fed. R. Civ. P. 56(b).


II.    *Standard of review.*

In *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002), the Third Circuit set forth the standard for deciding a summary-judgment motion:

> Summary judgment is proper if after
> considering "the pleadings, depositions,
> answers to interrogatories, and admissions
> on file, together with the affidavit, if
> any, . . . there is no genuine issue as to
> any material fact and . . . the moving party

> is entitled to judgment as a matter of law."
> Fed. R. Civ. P. 56(c). An issue is genuine
> "if the evidence is such that a reasonable
> jury could return a verdict for the
> nonmoving party." *Anderson v. Liberty Lobby,
> Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91
> L.Ed.2d 202 (1986). In conducting that
> review, the non-moving party is entitled to
> all reasonable inferences and the record is
> construed in the light most favorable to
> that party. *Pollock v. American Tel. & Tel.
> Long Lines,* 794 F.2d 860, 864 (3d Cir.
> 1986).

With this standard in mind, we set forth the record for summary-judgment purposes, noting disparities in the evidence where appropriate. The record includes the verified complaint. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)."); *Chambers v. Upper Darby Twp.*, 1997 WL 164273, at *5 (E.D. Pa.).


III.  *Background.*


    A.  *The Shower-Stall Incident of June 10, 2005.*


        1.  *Plaintiff's Version.*

        FCI-Allenwood was in lockdown from June 7, 2005, through June 17, 2005, after a large-scale disturbance. (Doc. 1, Compl., pp. 2-3; doc. 45, Defs.' statement of material facts, ¶ 3). On June 10, 2005, Plaintiff was taking a shower, limited to

five minutes because of the lockdown. (Doc. 1, Compl., pp. 2-3; doc. 24, p. 1). Defendant Ranck was monitoring the shower and told Plaintiff when two minutes were up. At a little past four minutes, defendant Clarkson "burst into [the] shower stall and ordered Plaintiff to put his hands behind his back." (Compl., p. 4). When Plaintiff tried instead to first reach for a towel "to cover his nakedness," Clarkson "attack[ed]" him so that he could handcuff him. (*Id.*). "Then other officers attacked Plaintiff in that shower stall . . . eventually handcuffing him behind his back." (*Id.*). Defendant Bittenbender participated in the attack (*id.*, p. 5), and Ranck helped direct it, although she did not participate in it. (*Id.*, p. 12). However, she did "continue[ ] the humiliation and abuse . . . by refusing to return Plaintiff's eyeglasses for another thirty hours." (*Id.*, p. 12).

"Plaintiff was dragged out of the shower stall, entirely naked . . . paraded throughout the unit, with at least a three minute wait at the head of the steps leading down to his cell, in full view of most inmates . . . and in front of all the officers  in the unit at the time," including five females officers. (*Id.*, p. 4). Plaintiff was in full view of the video cameras on the unit and was subjected to verbal abuse from officers while being returned to his cell. Defendant Bittenbender threw Plaintiff into his cell. (*Id.*, p. 4). On June 16, 2005, a correctional officer told him the videotapes were

being repeatedly played for the enjoyment of the officers who were not present at the time. (*Id.*, p. 5).

Three witnesses support Plaintiff's version of events. In pertinent part, Kittrell B. Decator, an Allenwood inmate at the time, affirms that on the morning of June 10, twelve correctional officers entered the cell block, about five of whom were female. Five-minute showers were announced for any inmate who wanted one.  Defendants Ranck and Bittenbender were standing outside the stall Plaintiff was using. Ranck motioned for other officers to come over. Eventually, three did and about two minutes later, two officers entered the stall and removed Solen. Three officers then "conducted" Solen, "stark naked" and handcuffed behind his back, to the sally-port area for Plaintiff's unit. As Plaintiff was led along, enough pressure was placed on the cuffs to make it look as if "Solen was walking on air." (Doc. 67, Decator penalty-of-perjury declaration).

Two other inmates have also supplied penalty-of-perjury declarations consistent with Decator's. Elbio Espaillat heard Ranck announce a "two-minute warning" to Solan and then seconds later saw officers entering the stall and removing Plaintiff. At first, Solan held a towel around his middle, but it fell away as he was being handcuffed, and Solan was naked as he was "dragged" to the sally port, where he stood for about two minutes. (*Id.*, Espaillat penalty-of-perjury declaration).

In pertinent part, Gary Rahim Watkins affirmed that less than three minutes after Solan entered the shower, Ranck radioed for officers and directed them to remove Solan from the shower. Two officers did so, with Solan naked. He had a towel in one hand "but it covered nothing. He was handcuffed behind his back." Along with Ranck, another female officer was present. Ranck "sort of cover[ed] her eyes," but the other female officer looked at Solan. Solan "was being jacked up by the handcuffs so that he was walking on tip toe," and four officers "roughly conducted" him to the sally-port area. Defendant Bittenbender "pushed Solan hard on the back of the head into [his] cell." Solan's total time of exposure was about a minute. (*Id.*, Watkins penalty-of-perjury declaration).

    2.  *Defendants' Version.*

During the lockdown, inmates were allowed three-to-four minute showers. The shower stalls have a swinging door, open at the top and bottom, but obscuring the occupant's mid-section. Solan was advised by staff that he had two minutes left for his shower. When Solan refused to leave the shower, staff entered the stall to remove him, including defendants Bittenbender and Clarkson. Before reopening the shower door, staff placed Solan in handcuffs loosely enough that he could keep his towel around his waist, which he was allowed to do. Solan was given the option to either return to his cell or to be placed in the SHU, and he requested to be placed in his cell.

6

"Staff then escorted Solan from the shower unit to his cell."
(Doc. 45, Defs.' statement of material facts, ¶ 19). "Solan was
compliant with the escort and no further assistance was needed."
(*Id.*, ¶ 20).

"Defendant Ranck gathered Solan's belongings from the
shower, which included soap, a soap dish, a pair of eyeglasses,
and a few other items." (*Id.*, ¶ 21). "Ranck placed the items on
a table in front of Solan's cell because she did not have a key
to his cell at that time." (*Id.*, ¶ 23). "Sometime later,
Defendant Ranck saw the items still lying on the table and
returned them to Solan." (*Id.*, ¶ 23).

Solan grieved the staff's treatment of him during the
incident, but in an interview with defendant Feltman, he said
that  staff had not "attacked or physically abused" him. (*Id.*, ¶
28). The video of the incident does not exist because of the
rotation of the video tapes. (*Id.*, ¶ 31).

B.   *The July 3, 2005, Placement in Segregated Housing*.

On July 3, 2005, Plaintiff fractured his arm while
playing handball. He was taken to the local hospital for
treatment. According to Plaintiff, the common practice for an
inmate taken out of the prison for a short period of time for
medical treatment is to put him back in his own cell upon his
return. Plaintiff's cell was a two-man one where he had lower-
bunk status. (Compl., p. 7). However, upon Plaintiff's return a
few hours later, defendant Shepard placed him in the segregated

housing unit (SHU) under twenty-four-hour lockdown. (*Id.*, p. 13). Shepard said this was for "security reasons," but Plaintiff alleges his placement in the SHU with a broken arm and awaiting an operation was in retaliation for his complaints after the shower-stall incident. (*Id.*, p. 6). Plaintiff alleges that defendant Ranck participated in the decision to take away his cell. (*Id.*, p. 12).[1] Plaintiff has also supplied the penalty-of-perjury declarations of two inmates who affirm that when they were sent to the hospital for operations, they were returned to their original cells. (Doc. 66).

Plaintiff's SHU cell mate for the forty-eight hours before Plaintiff's operation, scheduled for July 7, was "a highly disturbed and hyperactive inmate" who "turned Plaintiff into a nervous wreck and kept him up day and night." (Compl., p. 7). The cell mate came into the cell spraying blood from a head wound "inflicted . . . by his previous cellie, whom he probably also drove crazy." (*Id.*).

According to Defendants, while Solan was at the hospital, someone informed him of his next appointment. (Doc. 45, Defs.' statement of material facts, ¶ 34). "Because this knowledge could have posed a threat to the safety and security

---

[1]   In his opposition to summary judgment, Plaintiff attempts to expand this claim to include retaliation for the filing of two previous grievances, one against the head of the prison commissary for unprofessional conduct and the other a request for kosher food during Passover in 2005. (Doc. 71, p. 4, referring to ¶ 34 on pp. 22-23).  These allegations were not in the complaint and will therefore not be considered.

of the institution, Solan was placed in the SHU for security purposes."  (*Id.*, ¶ 35).

      C.  *The Attempted Placement on July 7 in a Six-Man Cell After His Return From His Operation.*

According to Plaintiff, on July 6, defendant Levi, in the presence of Warden Williamson, falsely told Plaintiff that his original two-man cell and property were being secured for him after his return from his operation the next day. In fact, defendant Ranck, probably with the full knowledge of defendant Levi, had already given the cell away, contrary to the prison policy of saving the cells of inmates who leave the prison for outside medical care. (Compl., p. 7).

Plaintiff had his operation on July 7. Two pins were placed in his arm, and it was casted. When he returned to the prison at about 9:00 p.m. that night, in enormous pain and still disoriented from anesthesia, he found "his property and institutional materials packed in total disarray," and that while he was being placed in his old unit, it was not in his two-man cell. Instead, he was being offered a top bunk in a six-man cell "with totally incompatible" cell mates. The bunk had a filthy mattress without bedding or pillows. Defendant Ranck was one of those responsible for not giving him a suitable bed assignment.  (*Id.*, p. 12). She also signed off on an incident report, dated July 13, 2005, charging Plaintiff with not accepting the bed assignment. (*Id.*).

9

When Plaintiff refused this assignment, he was placed in the SHU again. For the next seven days he was assigned the middle bunk in a three-man SHU cell where one occupant was "a 22-hour-a-day, ranting, raving, violent delusional, mad man . . . ." (*Id.*, p. 8). Plaintiff slept on the filthy floor, all the time suffering verbal threats and ravings. On July 14, Plaintiff was released, to a six-man cell in his old unit.

On August 11, 2005, Plaintiff was told he was going to be transferred to USP-Canaan, Waymart, Pennsylvania. However, Allenwood's medical department vetoed the transfer because Plaintiff's condition prevented him from traveling at the time. (*Id.*, p. 8-9).

D.   *Other Retaliation Claims.*

In addition to his July 3 placement in the SHU, Plaintiff alleges that the July 7 attempt to place him in the six-man cell in his old unit and the ultimate placement in the three-man SHU cell were in retaliation for his complaints about the June 10 shower-stall incident.

He also alleges his transfer to USP-Canaan was retaliatory as well, for seeking administrative relief for the June 10 incident. (*Id.*, p. 10). Records show that a transfer request was made, dated December 29, 2004, and signed by Warden Williamson, requesting that the BOP transfer Solan to USP-Canaan on the ground that Canaan (then a new facility) could use the increase in population.  (Doc. 44, Ex. 4, Attach. 4).

E.   *Other Claims*.

In addition to the allegations against her above, defendant Levi is alleged to have rubber-stamped everything the officers did on June 10 and afterwards, as evidenced by her handling of Plaintiff's BP-8s of June 22, 2005, and July 26, 2005, and approval of punishment for refusing the bed assignment of July 3. (Compl., p. 14). "[G]iven her position of authority," she was also "probabl[y]" involved in his retaliatory transfer to USP-Canaan. (*Id.*).

Defendant Feltman is alleged to have conducted a false investigation of the June 10 shower-stall incident, (*id.*), and "likely" "had something to do" with the disappearance of the videotape. (*Id.*, p. 15).

Defendant Williamson, the former warden, "had to know of the general facts of June 10th and so it can be presumed he was . . . covering up the truth of June 10th in his response of August 18, 2005." (*Id.*). The warden also had "ultimate authority" in approving transfers and ultimate authority over security videotapes. Plaintiff alleges the videotape of June 10 was destroyed even though he asked the warden to preserve the tape in a BP-9 filed June 24, 2005. (*Id.*).

In addition to the claims against her above, Defendant Ranck lied in response to Plaintiff's initial BP-8 about the shower-stall incident and refused any relief on a later BP-8 dealing with his room assignments on and after July 3. (*Id.*, p.

11

12). Finally, Plaintiff alleges in his "Relief Requested" section of the complaint that he "has been selectively treated very harshly during his term of imprisonment" because he is an "old non-violent, disputatious, Jewish intellectual." (*Id.*, p. 17). In his opposition to summary judgment, he limits this claim to the alleged treatment on June 10, 2005. (Doc. 71, p. 4).

In a filing captioned as "first amendments to original complaint," (doc. 24), Plaintiff specifies he is seeking only nominal and punitive damages and not compensatory damages. He is also seeking injunctive relief prohibiting the BOP from punishing him or confining him in restricted housing without a written order from the Attorney General. (Doc. 24, pp. 3-4).

IV.   Discussion.

    A.   *The Claims Against Warden Williamson and Unit Manager Levi And the Need for Personal Involvement in a Civil-Rights Claim.*

Defendants have moved to dismiss the claims against Warden Williamson and Unit Manager Levi on the basis that Plaintiff has not alleged the personal involvement of these defendants necessary for a civil-rights violation.

"A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . Personal involvement may be shown through allegations of personal direction or actual knowledge and acquiescence." *Rode v.*

12

*Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988). *See also Sutton v. Rasheed*, 323 F.3d 236, 249 (3d Cir. 2003)(citing *Rode*). Liability may not be imposed under § 1983 on the traditional standards of respondeat superior. *Rode*, 845 F.2d at 1207-08. As also stated, "supervisory personnel are only liable for the § 1983 violations of their subordinates if they knew of, participated in or acquiesced in such conduct." *Capone v. Marinelli*, 868 F.2d 102, 106 n.7 (3d Cir. 1989) (citing *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976)). These principles apply to civil-rights cases against federal defendants as well as against state defendants. *See Anderson v. Bureau of Prisons*, 176 Fed. Appx. 242, 243-44 (3d Cir. 2006)(per curiam)(nonprecedential)(citing *Rode* in requiring federal defendants to have personal involvement before imposing civil-rights liability).

In moving to dismiss the claims against Williamson and Levi, Defendants argue Plaintiff has alleged liability based only on their supervisory roles. In regard to Williamson, they assert that liability is based on his authority to review the administrative denials of Plaintiff grievances and his authority over transfers of inmates. In regard to Levi, they assert her liability is defectively based on her deception of Plaintiff in falsely telling him he would keep his original cell after his return from the hospital, her denial of his administrative remedies, participation in Plaintiff's transfer, and the

confiscation of personal items from him on July 6, 2005, in
retaliation for filing grievances.

In opposition, Plaintiff argues Williamson can be
liable for covering up the truth of what happened to Plaintiff,
that Levi can be held liable for "encouraging or participating
in retaliation against the Plaintiff through taking away his
cell and further punishment at a time of his extreme
vulnerability," and that they both can be liable for the
retaliatory transfer. (Doc. 71, Pl.'s B. in Opp'n at p. 7).

To resolve this dispute, we turn to the allegations of
the verified complaint. The allegations against Williamson are
that he "had to know of the general facts of June 10th and so it
can be presumed he was . . . covering up the truth of June 10th
in his response of August 18, 2005." (Compl., p. 15). The warden
also is alleged to have had "ultimate authority" in approving
transfers and ultimate authority over security videotapes.
Plaintiff alleges the videotape of June 10 was destroyed even
though he asked the warden to preserve the tape in a BP-9 filed
June 24, 2005. (*Id.*).

We agree with Defendants that these allegations are
insufficient to show the personal involvement of the warden.
Plaintiff does not allege that the warden was at the shower
stall on the day of the incident, so the warden could not have
known what the facts were. Thus, there is no reason to infer he
was covering up. Additionally, the failure of a prison official

14

to act favorably on an inmate's grievance is not itself a constitutional violation. *See Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999); *McGuire v. Forr*, 1996 WL 131130, at *1 (E.D. Pa. Mar. 21, 1996); *Flanagan v. Shively*, 783 F. Supp. 922, 931 (M.D. Pa. 1992). "Prisoners are not constitutionally entitled to a grievance procedure . . ." *Wilson v. Horn*, 971 F. Supp. 943, 947 (E.D. Pa. 1997), so a claim that the official decided the grievance falsely adds nothing to the claim. Finally, the warden's "ultimate authority" over transfers and security videotapes is just a theory of liability based on respondeat superior, an invalid theory for a civil-rights claim.

The allegations of the verified complaint against Levi are that on July 6, Levi falsely told Plaintiff that his original two-man cell and property were being secured for him after his return from his operation the next day, that she rubber-stamped everything the officers did on June 10 and afterwards, as evidenced by her handling of Plaintiff's BP-8s of June 22, 2005, and July 26, 2005, and her approval of punishment for refusing the bed assignment of July 3. (Compl., p. 14), and that "given her position of authority," she was also "probabl[y]" involved in his retaliatory transfer to USP-Canaan. (*Id.*).

We think the allegation that Levi falsely told Plaintiff on July 6 that he would get his original cell back upon his return from the hospital is sufficient to support the

personal-involvement aspect of a civil-rights claim against
Levi. That allegation relates to the retaliatory placement in
the SHU after Plaintiff refused the six-man cell assignment. The
remaining allegations are insufficient. That Levi "probably" was
involved in the transfer to USP-Canaan is not enough.
Additionally, the other allegations deal with her handling of
grievances, which as we have seen in regard to Warden
Williamson, fails to state a claim.

> B.   *The Eighth and Fourth Amendment Claims*
>      *Arising From the June 10 Shower-Stall*
>      *Incident.*

Plaintiff claims excessive force in violation of the
Eighth Amendment was used against him during the shower-stall
incident and that his constitutional rights were also violated
when he was removed from the shower naked and forced back to his
cell in that condition.[2]

Defendants argue they are entitled to qualified
immunity for the shower-stall incident. Claims of qualified
immunity are evaluated under a two-step process. "First, the
court must determine whether the facts, taken in the light most
favorable to the plaintiff, show a constitutional violation."
*Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002). Second, if
the plaintiff's "factual scenario" supports a constitutional

_____

[2]   As will be seen below, the latter is a Fourth Amendment
claim although Plaintiff cites the Eighth Amendment in its
support.

violation, the court must determine if a reasonable officer "would  have understood that his actions were prohibited." *Id.*

In support of qualified immunity, Defendants argue under the first step that there was no constitutional violation, relying on their own version of the facts. Under their evidence, they advised Solan of his remaining shower time, but Solan ignored the deadline, even after several orders to leave the shower. Staff were then called to remove him from the shower. In doing so, they placed Solan in restraints but also put a towel around his waist before leading out of the shower. Solan's eyeglasses were also later returned to him.

We reject this argument because we must use Plaintiff's version of events. *Bennett, supra*, 274 F.3d at 136. In that version, the officers seized Solan before his five minutes were up, pulled him out of the shower naked, and then dragged him back to his cell in that condition.  However, we agree with Defendants' additional argument that, even on Plaintiff's facts, no constitutional violation is established for an Eighth Amendment excessive-force claim.

Such a claim requires the consideration of several factors:

> (1) the need for the application of force;
> (2) the relationship between the need and
> the amount of force that was used; (3) the
> extent of the injury inflicted; (4) the
> extent of the threat to the safety of staff
> and inmates, as reasonably perceived by
> responsible officials on the basis of facts
> known to them; and (5) any efforts made to

> temper the severity of the forceful
> response.

*Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002)(quoted case omitted).  Additionally, "the Eighth Amendment does not protect an inmate against an objectively *de minimis* use of force.  *Id.* at 648.

In the instant case, we believe Plaintiff has established only the de minimis use of force. He admits he was not injured and that the defendant officers did not strike him. Their conduct consisted of taking hold of him, handcuffing him behind his back, and while he was in their grasp, forcing him to walk to his cell (with enough pressure on the cuffs to make it look like he was walking on air), at which point Bittenbender shoved him into his cell. Plaintiff and his witnesses described it as being "dragged" or "conducted."

This conduct is not sufficient for an excessive-force claim. "Not every push or shove" violates an inmates's Eighth Amendment rights. *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992)(quoted case omitted). And handcuffs would be subject to an excessive-force analysis when they are too tight, *see Kopec v. Tate*, 361 F.3d 772, 777-78 (3d Cir. 2004)(Fourth Amendment excessive-force claim during an arrest), a claim not made here. Further, the entire episode

lasted only two or three minutes. We will therefore grant Defendants summary judgment on the excessive-force claim.[3]

In regard to the claim that Plaintiff was dragged to his cell naked, we agree with Plaintiff that it survives summary judgment. The Fourth Amendment protects an inmate against the forced observation of his naked body, and it is an even greater invasion of privacy to be viewed naked by the opposite sex. *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994); *Johnson v. Pa. Bureau of Corrections*, 661 F. Supp. 425, 430 (W.D. Pa. 1987). Defendants argue that there is no claim here because Plaintiff had a towel around him while they moved him back to his cell, and he forced them to escort him to his cell. However, on Plaintiff's version of events, his shower was interrupted prematurely, and he was dragged naked back to his cell in full view of female officers, with the incident taking at least a few minutes. This supports a claim.

     C.   *The Retaliation Claim for Placement in Segregated Housing on July 3, 2005*.

On July 3, 2005, Plaintiff fractured his arm while playing handball, and he was taken to the local hospital for treatment. Upon his return a few hours later, he was placed in

---

    [3]  We will also grant summary judgment on any claim based on Ranck's failure to return Plaintiff's eyeglasses for thirty hours. Mere lack of access to eyeglasses for that period is not an Eighth Amendment claim.

the SHU. Plaintiff claims his SHU placement was in retaliation for his grievances about the shower-stall incident.

Defendants move for summary judgment on this claim by arguing that Solan was placed in the SHU, not because of a retaliatory motive, but because while Solan was at the hospital on July 3, someone told him of his next appointment on July 7. This information was a threat to the safety and security of the prison, so Solan was placed in the SHU for security reasons, not to retaliate.

A prisoner-plaintiff must prove three things to establish a retaliation claim: (1) that he engaged in a constitutionally protected activity; (2) he suffered "some adverse action" at the hands of a prison official; and (3) "a causal link between the exercise of [the] constitutional right[ ] and the adverse action taken." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

Defendants' evidence negates any causal link between Plaintiff's prison grievances and his SHU placement. Plaintiff does not rebut this evidence; he presents evidence only of the general practice to return an inmate to his original cell if he left the prison for a short period of time for medical treatment. But the general practice would not negate the need for SHU placement in particular situations like Plaintiff's.[4]

_____

[4] Defendants seem to also challenge the retaliation claim based on the July 7 SHU placement, justifying that placement by arguing that Plaintiff had refused a bed assignment upon his

    D.   *The Retaliation Claim for Transfer to*
         *USP-Canaan.*

Plaintiff claims he was transferred to USP-Canaan to retaliate for filing grievances concerning the shower-stall incident. Defendants move for summary judgment, arguing that the transfer was made because Plaintiff requested it. In support, Defendants have submitted records showing that a transfer request was made, dated December 29, 2004, and signed by Warden Williamson, requesting that the BOP transfer Solan to USP-Canaan.

As Plaintiff argues, this is not evidence that Plaintiff requested the transfer. Review of the transfer request indicates that the warden, not Solan, requested it and did so on the ground that Canaan (then a new facility) could use the increase in population. We therefore deny the motion for summary judgment on the retaliatory transfer claim.

V.    *Conclusion.*

Based on the foregoing, judgment will be entered for Defendants on the following claims: (1) the Eighth Amendment excessive-force claim based on Plaintiff's forced removal from the shower stall on June 10, 2005 (including the claim based on

---

return from the hospital. (Doc. 44, Defs.' B. in Supp., p. 15). This does not defeat the claim because Plaintiff alleges that the bed assignment (a six-man cell) was itself retaliatory for filing grievances.

the absent eyeglasses); (2) retaliatory placement in segregated housing on July 3, 2005; (3) all claims against former warden Williamson; and (4) all claims against Levi except for her involvement in Plaintiff's not getting his original cell back and his SHU placement after he refused the six-man cell assignment on July 7.

The following claims also remain: (1) a Fourth Amendment claim for being removed from the shower and marched back to his cell while naked and shackled; (2) an equal-protection claim alleging that the forced removal from the shower and the naked escort was because Plaintiff is an elderly, peaceful Jewish intellectual; (3) retaliatory transfer to USP-Canaan; (4) retaliatory placement in a segregation cell from July 5, 2005, through July 7, 2005; (5) retaliatory refusal to return Plaintiff to the cell he occupied before July 3; (5) the retaliatory attempted placement on July 7 after his return from an operation in a six-man cell and then when he refused this assignment, placement in segregated housing; and (6) Defendant Feltman's false investigation of the June 10 shower-stall incident and his "likely" involvement in the disappearance of the videotape.

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: January 18, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID SOLAN,                          :
                                      :
          Plaintiff                   :
                                      :
          vs.                         :    CIVIL NO. 1:CV-06-0049
                                      :
                                      :
MS. V. RANCK, nee Hursh, et al.,:
                                      :
          Defendants                  :


*ORDER AND JUDGMENT*

        AND NOW, this 18th day of January ,2007, upon

consideration of Defendants' motion (doc. 41) for summary

judgment, it is ordered that:

        1.  The motion (doc. 41) is granted in
        part as follows:

            a.  Judgment is entered in favor of
        defendant Williamson and against Plaintiff
        on all claims against Williamson.

            b.  Judgment is entered in favor of
        defendant Levi and against Plaintiff on all
        claims against defendant Levi except for her
        involvement in Plaintiff's not being
        returned to his original cell, and his SHU
        placement after he refused the six-man cell
        assignment on July 7.

            c.  Judgment is entered in favor of
        all defendants and against Plaintiff on the
        following claims: (a) the Eighth Amendment
        excessive-force claim based on Plaintiff's
        forced removal from the shower stall on June
        10, 2005 (including the claim based on the
        absent eyeglasses); and (b) retaliatory
        placement in segregated housing on July 3,
        2005.

        2.  In all other respects, the motion is
denied.


                                    /s/William W. Caldwell
                                    William W. Caldwell
                                    United States District Judge