IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID SOLAN,                    :
                                :
          Plaintiff             :
                                :
          vs.                   :    CIVIL NO. 1:CV-06-0049
                                :
                                :
MS. V. RANCK, nee Hursh, et al.,:
                                :
          Defendants            :


*M E M O R A N D U M*

I.   *Introduction*

        The pro se plaintiff, David Solan, currently an inmate
at FCC-Peterburg, Petersburg, Virginia, filed this civil-rights
action for various events occurring while he was an inmate at
FCI-Allenwood, White Deer, Pennsylvania.

        On an early defense motion for summary judgment, we
dismissed the following claims and defendants: (1) an Eighth
Amendment excessive-force claim based on Plaintiff's forced
removal from a shower stall on June 10, 2005 (including a claim
based on absent eyeglasses); (2) a retaliation claim based on
placement in segregated housing on July 3, 2005; (3) all claims
against former warden Williamson; and (4) all claims against
defendant Espinoza-Levi except for her alleged involvement in
Plaintiff's not getting his original cell back and his July 7
placement in segregated housing after he refused a six-man cell

assignment in his old unit. *See Solan v. Ranck*, 2007 WL 141918, at *9 (M.D. Pa. Jan. 18, 2007).

We permitted the following claims to proceed: (1) a claim for Plaintiff's being removed from the shower and marched back to his cell while naked and shackled, a claim we recognized under the Fourth Amendment; (2) an equal-protection claim alleging that the forced removal from the shower and the naked escort were because Plaintiff is an elderly, peaceful Jewish intellectual; (3) a retaliation claim for his transfer to USP-Canaan, Waymart, Pennsylvania; (4) a retaliation claim for placement in a segregation cell from July 5, 2005, through July 7, 2005; (5) a retaliation claim for refusal to return Plaintiff to the cell he occupied before July 3; (6) a retaliation claim for the attempt to place him in a six-man cell on July 7, after his return from an operation, and then when he refused this assignment, his placement in segregated housing; and (7) a claim that defendant Feltman made a false investigation of the June 10 shower-stall incident and was "likely" involved in the disappearance of the videotape covering the incident. *Id.*

The following Allenwood officials and former official and officers remain as defendants: Viola Ranck, a unit counselor; Scott Clarkson, a former lieutenant at Allenwood; Kevin Bittenbender, the disciplinary hearing officer; Lt. Shepard, a lieutenant at the prison; Ms. Angel Espinoza-Levi,

Plaintiff's unit manager at the time pertinent to this action;
and Lt. Brian Feltman, an SIS officer.

We are considering their motion for summary judgment
under Fed. R. Civ. P. 56(b), made after a period for discovery.
We will evaluate the motion under the well established standard.
*See Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

II.   *Background*

Based on the parties' filings, but mostly following
the defendants' statement of material fact (SMF), and often
borrowing their language, the following is the record for
summary-judgment purposes.

A.   *The Shower-Stall Incident of June 10, 2005*

During Plaintiff's incarceration at FCI-Allenwood, at
about 7:00 p.m. on June 7, 2005, "there was a major riot in the
rec area." (Doc. 117-2, Ex. 1, Solan Dep. p. 19.) Because of the
riot, numerous inmates were placed in the Special Housing Unit
(SHU). The prison was also placed on lockdown from June 7, 2005,
through approximately June 17, 2005.

When an entire institution is locked down,
precautionary security measures are taken due to the heightened
watchfulness. During this Allenwood lockdown, staff prohibited
open movement within the units and compound most of the time.
Many programs were suspended, placing more responsibility on
staff (because they do not have the assistance of inmates during

3

the lockdown). Tensions are also high during lockdowns, and during this particular one, many inmates who had not been involved in the riot resented the restrictions the lockdown caused.

Between June 7, 2005, and June 10, 2005, Allenwood staff did not allow inmates to shower because of the lockdown. On June 10, 2005, at about 8:30 a.m., staff informed inmates of the availability of showers, but the inmates would only have between four and five minutes to take a shower. This limitation was imposed to ensure the safety of everyone in the institution; a limited amount of time to shower allowed inmates to shower while minimizing the amount of time they were out of their cells.

Inmates were instructed to come out of their cells in their underwear, t-shirt and shower shoes. For safety concerns due to the riot, staff "quickly searched" the inmates. Staff then escorted inmates to the unit showers. The shower stalls have a swinging door, open at the top and bottom, but obscuring the occupant's mid-section.

It took Solan twenty-five seconds to walk to the stall from his cell. He thought that he heard that it was a four-minute time limit on showers. (Doc. 117-2, Ex. 1, Solan Dep. p. 38.) He "got in [a]nd realized [he] had very, very little time to take a shower." (*Id.* pp. 18-19.) Solan said, "Two minutes into the shower, while I still had a lot of soap on my body, I

heard Ms. Ranck [say] something to the effect that you have a two minute warning or you have two minutes to go or perhaps she said you have been in two minutes." (*Id.* pp. 24-25.)

According to Solan, he spent two more minutes in the shower for a total of about four minutes and thirty seconds. Just seconds after he turned the water off, defendant Clarkson, with handcuffs in hand, slammed the shower door open and in a "vicious" tone told him to put his hands behind his back. (*Id.* pp. 25-26.) Clarkson stated that it took him "several minutes" to get to the unit after being notified by radio. (Doc. 117-2, Ex. 3, Clarkson Decl. ¶ 12.) Inmate Watkins saw Ranck talking on the radio about three minutes after the shower began before guards appeared at the stall. (Doc. 67, Watkins Decl. p. 1.) Watkins and two other inmates, Decator and Espaillat, saw Ranck direct guards to the showers. (Doc. 67, Decator, Espaillat and Watkins Declarations).

Solan admits he did not comply with that order and instead, without saying a word to Clarkson, reached for his towel. According to Plaintiff, when Clarkson saw him do this, Clarkson realized Plaintiff was not "going to turn around to be handcuffed behind [his] back while [he] was naked and wet," (Doc. 117-2, Ex. 1, Solan Dep. p. 26), so Clarkson "attacked" him. Plaintiff did not fight back; he "fought merely to get the towel around [his] waist," (*id.*), but Clarkson was trying to prevent this because it was his intent to handcuff Plaintiff

5

while he was naked. (*Id.*) Plaintiff managed to get the towel around his waist and thinks he was holding it with his left hand while Clarkson was holding his right hand and trying to get his left hand behind his back as well. Plaintiff struggled with him, "trying to hold the towel in place around [his] waist because he did not want to go out of the shower naked." (*Id.*, p. 27.)

Clarkson was forcing Plaintiff out of the shower backwards when Defendant Bittenbender arrived and forced Solan's left hand behind his back, causing the towel to drop to the side while Plaintiff still held it in one hand. (*Id.*, p. 27.) Plaintiff was handcuffed behind his back, dragged out of the shower, and "turned around frontally to face a number of women and probably over a hundred inmates," as well as a "number of male guards." (*Id.*). The women (apparently five in number) were standing a few feet away from Plaintiff and looking in his direction. (*Id.* p. 41.) However, defendant Ranck denies seeing him naked while he was being removed from the shower (or later when being escorted back to his cell). (Doc. 122, Ranck Decl. ¶ 11.)

More officers surrounded him, at least four total. They gripped him tightly and moved him to the sally-port area of the unit, keeping him on his tiptoes as they went. He was detained at the sally-port area for what he believed was about two minutes but his witnesses said it was shorter. Bittenbender asked him whether he wanted to go to the SHU or to his cell.

(Doc. 117-2, Ex. 1, Solan Dep. p. 28.) They took him to his cell and threw him in, with Bittenbender giving him a powerful blow to the back of his head. (*Id.*, p. 29.)

Solan was not physically injured but does claim emotional and psychological injuries as a result of the "open display of his naked body in front of over a hundred people." (*Id.*,p. 70). He never sought counseling for these psychological injuries. (*Id.*).

On June 20, 2005, he began proceedings under the BOP grievance process by filing an "informal resolution" form. (Doc. 117-2, Ex. 7). He eventually exhausted all of his administrative remedies. (*Id.* Exs. 8-10.)

B.  *The Transfer to USP-Canaan*

Plaintiff was formerly incarcerated at FCI-Allenwood, White Deer, Pennsylvania. On December 29, 2004, Plaintiff's unit team recommended him for transfer to USP-Canaan to build the population of that newly-constructed institution. (Doc. 118, SMF ¶ 2; doc. 117-2, Ex. 18, penalty-of-perjury decl. of Rick Lavella, Allenwood's case management coordinator, ¶ 6.) In general, the process is that a request for transfer is prepared by the inmate's case manager and approved by his unit manager. "[T]he recommendation is routed to the Case Management Coordinator, the Associate Warden of Programs, and then the Warden of the institution for final approval. Upon the Warden's approval, the document is forwarded to the Regional Office."

(Doc. 117-2, Lavella decl. ¶ 7.) "[T]he Regional Office [then] approves or disapproves the transfer." (*Id.*, ¶ 8.) On June 24, 2005, the Regional Office approved Solan's transfer to USP-Canaan. (*Id.*; doc. 118, Defs.' SMF ¶ 3.)

The inmate is then cleared for transfer but the actual transfer date is set by the Federal detention Center in Oklahoma. Solan's transfer happened on March 23, 2006, some nine months after the Regional Office's approval. Plaintiff was being treated for an arm injury suffered in a handball game (as explained below). "Due to this injury, his transfer was deferred pending medical treatment. Once Solan's treatment was completed and he was medically cleared for transfer, he was transferred to USP Canaan." (Doc. 117-2, Lavella decl. ¶ 12.)

According to Plaintiff, he was told at Allenwood by Chaplain Beadle in March 2005 "that he had indeed been put in for a transfer earlier, but that the request had been rescinded, perhaps at Chaplain Beadle's suggestion." (Doc. 149, Pl.'s Br. in Opp'n at p. 6, citing doc. 71, p. 20, ¶ 30). According to Plaintiff, he was also told by a case manager, David Ferry, in August 2005 "that he had indeed been put in for a transfer earlier to USP Canaan . . . around June of 2005, not December, 2004." (Doc. 149, Pl.'s Br. in Opp'n at p. 6, citing doc. 71, p. 22, ¶ 30). Plaintiff believes the transfer request was actually made on or about June 21, 2005. (Doc. 71, ¶ 31(d)). He was never told through official channels of this impending transfer.

Plaintiff has also prepared a document from the discovery made by the defense concerning the transfer of those Allenwood inmates recommended for transfer to Canaan in December 2004. According to Plaintiff, of the forty recommended for transfer on that date, thirty-six had already been bussed to Canaan in March 2005. (Doc. 149, Pl.'s Br. in Opp'n at p. 6, incorporating doc. 103, ¶¶ 13-15).

According to Plaintiff, while trying to get the assistance of Mr. Laino, Allenwood's health care administrator in obtaining X-rays of his arm, Laino told him that it was not his problem and that he was going to have Plaintiff transferred so that Plaintiff could not sue him about it. (Doc. 149, Pl.'s Br. in Opp'n at p. 8 and Ex. 1).

C. *Claimed Retaliatory Placements in Housing*
   *Not the Equivalent of the Two-Man Cell*
   *Plaintiff Occupied Before July 3, 2005*

On July 3, 2005, Solan injured his left arm while playing handball. Staff transported him to the outside hospital later that morning for treatment that lasted a few hours. During Solan's escort to the hospital, a physician informed Solan of his next appointment. Because this knowledge could have posed a threat to the safety and security of the institution, when Solan was returned to the prison later on July 3, he was placed in the SHU for security purposes until his operation, scheduled for July 7. 2005.

Although, on occasion, staff may hold the cell an inmate has been occupying while he attends a brief outside medical appointment and is expected to return that same day or the next day, staff cannot hold a cell for an inmate held overnight in a hospital or who has been placed in the SHU. Four days away from the cell is an especially long time.

Further, the policy for returning inmates who had been placed in the SHU is to return them to available cells in the same unit in the general population they had previously been in, usually a six-man cell. During this time, numerous inmates were in the SHU because of the recent riot and needed to be placed back in general population.

When Plaintiff came back to Allenwood on July 7 after his operation earlier in the day, prison personnel tried to place him in the cell he occupied before his July 3 accident, but that two-man cell was occupied. They then tried to place Plaintiff in a six-man cell in the same unit, but he refused. For refusing the cell assignment, Plaintiff was given an incident report and placed in the SHU. He was released from the SHU on July 14, 2005, and assigned to a lower bunk in a six-man cell. Neither Ranck nor Espinoza-Levi was on duty the night of July 7.

According to Plaintiff, on July 6, 2005, Defendant Espinoza-Levi, his unit manager, told him that "she would make sure that [he] was restored to [his] previous status because

[he] had done nothing wrong." (Doc. 118, SMF ¶ 53.)[1] However, when he returned to the prison at about 9:00 p.m. the night of July 7, in enormous pain and still disoriented from anesthesia, he found "his property and institutional materials packed in total disarray," and that while he was being placed in his old unit, it was not in his two-man cell. Instead, he was being offered a top bunk in a six-man cell "with totally incompatible" cell mates. The bunk had a filthy mattress without bedding or pillows.  (Verified Compl., p. 12).

Further, contrary to Defendants' position, Plaintiff maintains that cells have been saved for inmates who left the prison, and he submits two penalty-of-perjury declarations from inmates who indicate that they, or another inmate, left Allenwood for medical treatment and returned a few days later to their original cells. (Doc. 67, pp. 13-16, Decl. of Ryan Hale and Eric Warren.)

D.  *The Claim that Defendant Feltman*
    *Made a False Investigation of the*
    *June 10 Shower-Stall Incident*

Defendant Feltman investigated the June 10 shower-stall incident. Plaintiff alleges he made a false investigation and that  he "likely" "had something to do" with the disappearance of the videotape of the incident. (Compl., p. 15).

---

[1] Espinoza-Levi denies providing this assurance. (Doc. 117-2, Espinoza-Levi Decl. ¶ 6.)

The video footage Solan refers to does not exist due to the rotation of the videotapes. (Doc. 118, SMF ¶ 62.)

E.  *The Equal-Protection Claim that Plaintiff
    Was Forceably Removed From the Shower and
    Escorted Naked to His Cell Because Plaintiff
    Is an Elderly, Peaceful Jewish Intellectual*

Defendant assert there is an absence of evidence that Plaintiff was treated differently because he is an elderly, peaceful Jewish intellectual, noting that Plaintiff claims an African-American inmate was treated the same way.

III.  *Discussion*

A.  *The Shower-Stall Incident of June 10, 2005*

Defendants argue that defendants Bittenbender, Clarkson and Ranck are entitled to qualified immunity. Claims of qualified immunity are evaluated under a two-step process. First, the court must determine "whether the facts alleged, taken in the light most favorable to the plaintiff," show a constitutional violation. *Barton v. Curtis*, 497 F.3d 331, 335 (3d Cir. 2007)(quoted case omitted). Second, if a violation is made out on the plaintiff's version of the facts, the court must determine if the right had been "clearly established." *Id.* (quoted case omitted).

On the first step of the qualified immunity defense, Defendants argue that Plaintiff's Fourth Amendment rights were not violated in the circumstances surrounding Plaintiff's June

10, 2005, shower.[2] They present the right as one not to be observed naked by members of the opposite sex and contend constitutional violations have only been found when such observation is frequent, regular and predictable, citing *McCullar v. Babb*, No. 1:05-CV-042 WCL, 2006 WL 623604, at *5 (N.D. Ind. March 10, 2006). They argue there is no violation when observation is just occasional, *id.* at *5, or where the observation was an anomaly caused by the inmate himself, citing *Riddick v. Sutton*, 794 F. Supp. 169, 170, 173 (E.D.N.C. 1992). They further argue that females have been allowed to observe male inmates under emergency situations, citing in support *Canedy v. Boardman*, 16 F.3d 183, 187 (7th Cir. 1994), where the Seventh Circuit noted that the case law had established that in emergency situations female guards could observe strip searches of male inmates.

Defendants next turn to the specific situation in the case at bar. The prison was in lockdown, and guards were mindful of increased tensions and safety concerns. Plaintiff was being permitted a four-minute shower, a time limitation imposed so that all inmates could shower, given the lockdown. After his

---

[2]   In our January 18, 2007, memorandum dealing with Defendants' motion to dismiss, or in the alternative, for summary judgment, we concluded that Plaintiff had a Fourth Amendment claim, not an Eighth Amendment one, as Plaintiff had asserted. We cited in support *Canedy v. Boardman*, 16 F.3d 183, 187 (7th Cir. 1994), and *Johnson v. Phelan*, 69 F.3d 144, 147 (7th Cir. 1995), cases using the Fourth Amendment to analyze the constitutionality of prison practices allowing female guards to perform routine duties, practices that inevitably led to random observation of male inmates in the nude.

time expired, Solan disobeyed an order to leave the shower, thereby requiring the guards to attempt to remove him, and he then struggled with them, refusing to obey an order to place his hands behind his back so that he could be handcuffed. Defendants assert that Plaintiff's "actions actually increased the already charged atmosphere in the prison." (Doc. 117, Defs.' Supp'n Br. p. 7).

In this context, Defendants argue there was no Fourth Amendment violation. Here, any female observation of Plaintiff occurred during a lockdown, certainly not a regular occurrence, and which, in Defendants' view, also presents an emergency situation. They further maintain that we must take into account that any female observation of Plaintiff was only a single incident and took at most only three to four minutes under Plaintiff's version, and even shorter by the testimony of some of his own witnesses. Further, Plaintiff had overstayed his time in the shower, refusing an order for handcuffing and actually struggling with the officers. In these circumstances, in light of the need to maintain the orderly and safe running of the prison, Clarkson and Bittenbender committed no Fourth Amendment violation in removing Solan from the shower naked, even if it would mean he would be viewed by female guards, or anyone else.

In opposition, Plaintiff argues that he can present his claim under the Eighth Amendment. Parenthetically, it seems that both the Fourth and Eighth Amendments have been employed to

14

analyze claims that guards have observed unwilling inmates naked. *See Sinkfield v. Culliver*, No. 03-0432-WS-M, 2005 WL 2665348, at *5, 6-7 (S.D. Ala. Sept. 28, 2005) (using both the Fourth and Eighth Amendments to analyze inmate's claim that he was forced to shower nude in front of female guards). *See also Johnson v. Phelan*, 69 F.3d 144, 147 (7th Cir. 1995)(holding that a claim that female guards were allowed to observe male inmates naked should be analyzed under the Eighth Amendment, not the Fourth Amendment). On Defendants' motion to dismiss, or in the alternative, for summary judgment, neither party had adequately briefed the constitutional issues surrounding the shower-stall incident, so in our January 18, 2007, memorandum, we concluded initially that Plaintiff had a Fourth Amendment claim, but if he wants to pursue his claim under the Eighth Amendment, we will analyze his claim under Eighth Amendment law.

Plaintiff's claim is that "he was dragged out naked and handcuffed from the shower, partially hoisted into the air, in front of over a 100 witnesses, several of the opposite sex, all of whom he had daily contact with in the tight confines of the prison environment, *purely* for vindictive, malicious, and/or sadistic purposes of causing him intense psychological pain and humiliation." (Doc. 149, Pl.'s Br. in Opp'n, p. 3)(emphasis in original). He asserts the claim is an excessive-force claim and relies on language used in *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992), stating that an

Eighth Amendment violation occurs "[w]hen prison officials maliciously and sadistically use force to cause harm." He maintains that when the defendants forced him from the shower, they did so sadistically because it was done with the intent to humiliate him. He admits he suffered no physical harm but asserts that the psychological harm he suffered is sufficient for an Eighth Amendment claim.

The Eighth Amendment prohibits the unnecessary and wanton infliction of pain. *Id.* at 8, 112 S.Ct. at 1000. "'[U]nnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Hope v. Pelzer*, 536 U.S. 730, 737, 122 S.Ct. 2508, 2514, 153 L.Ed.2d 666 (2002)(quoted case omitted). The amendment has both an objective and subjective component. *Hudson*, *supra*, 503 U.S. at 8, 112 S.Ct. at 999-1000. The objective component, the harm suffered, depends upon the claim at issue. *Id.*, 112 S.Ct. at 1000. It is contextual and responsive to 'contemporary standards of decency.'" *Id.*, 112 S.Ct. at 1000 (quoted case omitted). In the excessive-force context, the objective component requires that the inmate's injury be more than de minimis. *Fuentes v. Wagner*, 206 F.3d 335, 345 (3d Cir. 2000) (citing *Hudson*, 503 U.S. at 9-10, 112 S.Ct. at 1000). The subjective component, as already stated, requires that the force be applied "maliciously and sadistically." *Id.* (quoting *Hudson*, 503 U.S. at 7, 112 S.Ct. at 999).

We have been unable to locate any precedential Third
Circuit cases applying the Eighth Amendment to claims by
prisoners about being seen naked by prison guards.[3] Other
jurisdictions have. The facts are different from our case, but
the decisions elsewhere provide some guidance.

In *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987), the
prison's policy authorized female guards to make the rounds of
the housing units. This policy allowed the guards full access to
the cells and shower areas of the male inmates. The plaintiff
inmate filed a grievance with prison authorities, seeking to
keep the female guards out of the shower area. He filed suit,
alleging that the female guards retaliated against him for doing
so, and punished and harassed him, by "allow[ing] themselves
unrestricted views of his naked body in the shower, at close
range and for extended periods of time." 821 F.2d at 1227-28.
Prefacing its discussion by noting that the Eighth Amendment
prohibits the wanton inflictions of pain totally without
penological justification, the Sixth Circuit held that this
stated an Eighth Amendment claim.

Similarly, in *Calhoun v. DeTella*, 319 F.3d 936 (7th
Cir. 2003), the Seventh Circuit, also invoking the standard
prohibiting pain inflicted totally without penological
justification, stated that a strip search of a male inmate in

---

[3] In a nonprecedential opinion, the Third Circuit rejected an
inmate's claim that a visual body-cavity search was conducted in an
unconstitutional manner. *Brown v. Blaine*, 185 Fed. Appx. 166 (3d Cir.
2006)(per curiam).

front of female guards would violate the Eighth Amendment if it was "conducted in a harassing manner intended to humiliate and inflict psychological pain." *Id.* at 938. The court thus allowed the inmate to proceed on a claim that a strip search performed by male officers violated the Eighth Amendment for the manner in which it was allegedly performed. The inmate had alleged that the search had been conducted in the open telephone area of a prison day room in front of female guards who had no penological reason for being there, with all the guards making ribald comments and sexually explicit gestures and forcing plaintiff to perform sexually provocative acts. *Id.* at 940.

Conversely, when the female guards' observations of naked prisoners are done for a valid penological reason, the Seventh Circuit has stated there is no Eighth Amendment violation. In *Johnson v. Phelan*, 69 F.3d 144 (7th Cir. 1995), prison policy allowed female guards to monitor male inmates so that the men could be seen "naked in their cells, the shower and the toilet." *Id.* at 145. The Seventh Circuit held there was no Eighth Amendment violation for two reasons. First, cross-sex monitoring was not a senseless imposition; it balanced the right of women to work in prisons with the privacy rights of inmates. 69 F.3d at 150-51. It therefore did not meet the objective component of the Eighth Amendment. Second, it did not meet the subjective component because the inmate had not alleged that the policy had been adopted to embarrass the male inmates. *Id. See*

*also Somers v. Thurman*, 109 F.3d 614, 622-23, 624 (9th Cir. 1997)(female guards' visual body-cavity searches and shower observations of male inmates did not violate the Eighth Amendment because the plaintiff did not allege that the searches were conducted without any penological justification (thus not meeting the subjective component) and because such cross-gender observations were not inhumane (thus not meeting the objective component). *Accord Peckham v. Wisconsin Dep't of Corr.*, 141 F.3d 694, 697 (7th Cir. 1998) (strip searches of female inmates by female guards did not violate the Eighth Amendment when performed for valid penological reasons, noting that there was no evidence that the searches were performed to harass or punish).

These cases indicate that Solan has an Eighth Amendment claim. To begin with, Plaintiff has met the subjective component for such a claim. He testified that Clarkson, with the assistance of Bittenbender, deliberately prevented him from placing his towel around his waist, something that could have been accomplished in a few seconds, and then dragged him naked back to his cell in front of a large group of people of both sexes. This allegation supports the inference that they intended to humiliate him, an action without any penological justification.

In the circumstances of this case, we think it is immaterial that, as Defendants argue, the prison was on lockdown

19

with the attendant safety and security concerns. On Plaintiff's version of events, it would only have taken a few seconds for him to have wrapped the towel around his waist. It is difficult to think of any security concerns arising from the lockdown that would have required Clarkson or Bittenbender to prevent him from doing so. Defendants have also argued this was an isolated incident and that the female guards would have only seen Plaintiff for a few minutes. The isolated nature of the incident does not defeat the claim. *See Hayes v. Marriott*, 70 F.3d 1144, 1147 (10th Cir. 1995)(single viewing of an inmate by prison officials of the opposite sex can be enough for a Fourth Amendment violation). It follows from this conclusion that observations for only a few minutes should not defeat the claim either since a single incident may take only a few minutes.

Defendants' arguments also ignore the full extent of Plaintiff's claim. He is not just arguing that females saw him nude but males as well. Although limited in the prison context, a person has a basic right of privacy in his naked body, not just in not having it viewed by the opposite sex, although the interest is stronger in the latter circumstances. "Shielding one's unclothed figure from the view of strangers, particularly strangers of the opposite sex is impelled by elementary self-respect and personal dignity." *Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988)(footnote omitted). In *Canedy*, *supra*, the Seventh Circuit noted that "all forced observations or

inspections of the naked body implicate a privacy concern," albeit there is a greater invasion when the observation is by the opposite sex. 16 F.3d at 185. It also noted that "'[o]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. . . .'" *Id.* (quoted treatise omitted). Here, the claim is not simply that prison guards, male or female, could see Plaintiff nude; that is ordinarily accepted in the routine of the prison. Rather, it is that Clarkson and Bittenbender (and two other guards) deliberately put Plaintiff on display naked as they brought him back to his cell. The Eighth Amendment protects against such conduct. The objective component is satisfied by the unnecessary nakedness, the subjective component by the intent to humiliate in doing so.

Having decided that there is sufficient evidence for a jury to decide there was an Eighth Amendment violation, we also decide that this claim cannot proceed against Ranck. Plaintiff has provided us with no evidence that she knew what Clarkson and Bittenbender would do. There is evidence that she did call for guards to remove Plaintiff from the stall but whether she did it before the time limit expired or not is irrelevant since the Eighth Amendment claim here is that Clarkson and Bittenbender marched Plaintiff back to his cell naked.[4]

---

[4] We acknowledge that Plaintiff charges Ranck with knowing what the guards would do, but there is no evidence that she did know.

We move now to the second step of the qualified immunity defense and decide if the right had been "clearly established." If it was, then we must deny defendants Clarkson and Bittenbender qualified immunity.

On the second step, "[t]o find that a right is clearly established, 'the right allegedly violated must be defined at the appropriate level of specificity,'" *Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006)(quoted case omitted), but a general constitutional rule already established "may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Id.* (quoted case and internal quotation marks omitted). It must have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Barton*, *supra*, 497 F.3d at 335 (quoted case omitted).

On this second step, Defendants argued against a Fourth Amendment claim, but their arguments are relevant to an Eighth Amendment claim. First, even if Plaintiff has a constitutional right, it was not clearly established for two reasons. First, no case in the Third Circuit or this district has established that right in this context (argued on the Fourth Amendment claim but equally true as to an Eighth Amendment one.) Second, the lockdown created exigent circumstances, thereby allowing a reasonable officer to believe that no constitutional violation could occur by female guards viewing male inmates.

Third, even if no exigent circumstances existed, prison officials could reasonably believe there were, thereby entitling the defendants to qualified immunity, citing *Cookish v. Powell*, 945 F.2d 441, 449 (1st Cir. 1991)("The Supreme Court has said that a law enforcement official's reasonable, although mistaken, conclusion regarding the presence of 'exigent circumstances' supporting a warrantless search does not subject that official to personal liability.").

As part of this argument, Defendants assert that any factual dispute about the towel is immaterial. First, they contend there is no evidence that Bittenbender or Clarkson knew Plaintiff did not have the towel on him. Second, they contend that for safety reasons and to prevent the situation from escalating, they had to remove him from the shower, with or without his towel.

We agree with Defendants that Clarkson and Bittenbender are entitled to qualified immunity. We do so by looking to their argument elsewhere in their brief that all of Plaintiff's claims fail because Plaintiff alleges that he suffered only psychological injury. In making this argument, Plaintiff cited *Babcock v. White*, 102 F.3d 267, 272 (7th Cir. 1996), which held that an inmate's fear of assault from other inmates, an assault that never happened, was a psychological injury that was not a deprivation of the minimal civilized necessities of life for an Eighth Amendment conditions-of-

confinement claim. Closer to this case, other courts have held
that the psychological injury suffered by male inmates by being
seen naked by the opposite sex does not satisfy the objective
component for an Eighth Amendment claim. *See Johnson*, *supra*, 69
F.3d at 150-51 ("cross-sex monitoring" "cannot be called
'inhumane' and therefore does not fall below the floor set by
the objective component of the eighth amendment"); *Somers*,
*supra*, 109 F.3d at 624 (female guards' visual body-cavity
searches and shower observations of male inmates did not violate
the Eighth Amendment in part because such cross-gender
observations were not inhumane, thus not meeting the objective
component). What these cases mean is that no reasonable officer
could have known that his conduct in forcing an inmate back to
his cell naked would violate the Eighth Amendment since he could
have thought the objective component would not be satisfied,
even more so for observation by other men. Other courts of
appeals have reached the opposite conclusion, deciding that
psychological injury satisfies the objective component. *See
Calhoun*, *supra*, 319 F.3d at 939 ("the wanton infliction of
psychological pain is also prohibited"); *Kent*, *supra*, 821 F.2d
at 1227-28 (essentially concluding that a male inmate's
embarrassment at being seen by female guards satisfied the
objective component). But a split in the circuits indicates that
the law is not clearly established. *See Wilson v. Layne*, 526
U.S. 603, 618, 119 S.Ct. 1692, 1701, 143 L.Ed.2d 818 (1999).

We reject the defendants' other arguments. There does not have to be binding precedent from the Third Circuit, *see Williams*, *supra*, 455 F.3d at 192, and if circuit precedent is not necessary, it follows there does not have to be authority from this district. The lockdown does not appear to have created exigent circumstances justifying how Plaintiff alleged he was treated, or a reasonable conclusion that he could have been treated that way, at least on this record. The riot leading to the lockdown had ended roughly two days before on June 7.[5] We do not think that generalized tension or resentment during the lockdown is sufficient. As Plaintiff tells it, all Clarkson and Bittenbender had to do was let him put the towel around his waist.[6] That would have taken only a few seconds.[7]

    B.   *The Retaliation Claim for the Transfer to USP-Canaan*

Plaintiff claims his transfer from Allenwood to Canaan was in retaliation for seeking administrative relief for the June 10 incident. A prisoner must prove three things to

---

[5] *Compare Cookish v. Powell*, 945 F.2d 441, 449 (1st Cir. 1991)(on a Fourth Amendment challenge to visual body-cavity searches observed by a female prison supervisor but conducted by male guards in the immediate aftermath of a riot, court would not determine exactly when the emergency circumstances had ended but would conclude that a reasonable prison officer could decide that an emergency still existed.

[6] Plaintiff was struggling, but only struggling to put the towel around his waist, in his version.

[7] And contrary to Defendants' argument, there is evidence that Clarkson and Bittenbender knew the towel was not wrapped around Plaintiff; Plaintiff avers they prevented him from doing that.

establish a retaliation claim: (1) that he had engaged in a constitutionally protected activity; (2) that he suffered "some adverse action" at the hands of a prison official; and (3) that there is "a causal link between the exercise of [the] constitutional right[ ] and the adverse action taken." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). If the prisoner establishes these three things, "the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.*

Defendants argue that the evidence does not support a retaliation claim for the transfer to Canaan. First, they argue Plaintiff has failed to prove a causal connection. They contend that the nine-and-one-half months between the transfer and his administrative grievance over the shower-stall incident was too long for the Plaintiff to rely on the temporal proximity between the incident and the transfer to establish causation. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, ___ F.3d ___, ___, 2007 WL 2713026, at *12 (3d Cir. 2007)("Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment.") (employment-discrimination case); *see also Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)(in an employment-discrimination case, discharge two days after worker filed his discrimination

claim was by itself sufficient to establish a causal connection in a retaliation claim).

They also contend there is no evidence of (1) direct retaliatory statements or (2) a chronology of events that would support a retaliation claim, two other ways of establishing retaliation. *Id.* (noting that a prison officials' alleged warning that constitutional challenges to a prison program would result in denial of parole supported retaliation claim); *Alexander v. Forr*, No. 3:CV-04-370, 2006 WL 2796412, at *21 (M.D. Pa. Sept. 27, 2006)(causal connection can be established by "chronology of events from which the defendant's retaliatory animus can reasonably be inferred").

Second, the defendants argue that, even if Plaintiff can establish a causal connection, they have shown that Plaintiff would have been transferred anyway for a legitimate penological reason. On December 29, 2004, over six months before the shower-stall incident, the BOP recommended that Solan be transferred to Canaan to build the population of that newly constructed institution, a legitimate penological purpose. Approval came on June 24, 2005, and the transfer was made some nine months later on March 23, 2006, only because Solan was healing from his handball injury.

Third, the defendants argue that Plaintiff has produced no evidence that they had any personal involvement in the transfer, either that they had any part in the decision or

acquiesced in it. *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d
Cir. 2005)(personal involvement in the alleged wrongs is
necessary for the imposition of liability in a civil rights
action and can be established by personal direction or actual
knowledge and acquiescence).

In opposition, Plaintiff argues that the evidence does
support a temporal proximity that supports a causal relationship
between his grievance and the transfer. First, according to BOP
records, forty inmates were recommended for transfer in December
2004, and of that number, according to Plaintiff's analysis,
thirty-six had already been bussed to Canaan by March 2005, yet
Plaintiff was still at Allenwood in June. Second, in March 2005,
Chaplain Beadle told him "that he had indeed been put in for a
transfer earlier, but that the request had been rescinded,
perhaps at Chaplain Beadle's suggestion." According to
Plaintiff, he was also told by a case manager, David Ferry, in
August 2005 "that he had indeed been put in for a transfer
earlier to USP Canaan . . . around June of 2005, not December,
2004." Plaintiff thus argues that even if Allenwood officials
had recommended him for transfer in December 2004, that decision
had been cancelled at some point so that a reasonable inference
is that a new transfer decision was made on or about June 21,
2005, the day after he filed his informal-resolution beginning
the grievance process. Plaintiff points out that the defendants

agree that BOP approval of the transfer happened on June 24, 2005.[8]

This record is insufficient for Plaintiff to go to a jury on his retaliation claim. Plaintiff has not established that the December 2004 transfer recommendation was cancelled so that the June 24, 2005, transfer approval must have been based on a recommendation that occurred after June 20, 2005. There is therefore no temporal proximity. The hearsay from Chaplain Beadle does not indicate how Chaplain Beadle knew the earlier transfer request had been "rescinded" and the hearsay from counselor Ferry does not mention the earlier request at all, or specify what was meant by the transfer being "put in."[9] As to

_____

[8] Plaintiff advances other reasons that the transfer was retaliatory but they are either not supported by the record or we disagree that they are probative: (1) the transfer was not mentioned at team meetings with Plaintiff in August 2004 or February 2005, when such a matter is supposed to be brought up; (2) too much time elapsed between December 2004 and June 24, 2005, if the transfer recommendation was actually made in December 2004; (3) Plaintiff has been transferred through the federal penal system an inordinate number of times, making the transfer to Canaan part of a pattern of retaliatory transfers; (4) Plaintiff was not told about the transfer through an "official communication" to him; (5) only inmates with a clear-conduct record are transferred to new institutions and Plaintiff had been accused of defying orders in the shower-stall incident; (6) the transfer was first attempted on August 11, 2005, in haste when Plaintiff was in no condition to travel because of his hand ball injury; (7) there was tampering with the official records because the second transfer request was destroyed; (8) Canaan is a high-security prison but Plaintiff is a low-security inmate; and (9) viewing it as not his problem, Mr. Laino, Allenwood's health care administrator, told Plaintiff that he was going to have Plaintiff transferred so that Plaintiff could not sue him about Laino's refusal to assist Solan in obtaining copies of X-rays of his arm.

[9] On summary judgment, the nonmoving party can rely on hearsay evidence as long as the evidence could be put in admissible form at trial. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990), and we note here that the Beadle and Ferry hearsay

the March 2005 transfer of thirty-six inmates on the December 2004 list, we do not think it is probative that the prison did not transfer all the inmates on the list at the same time. In any event, even if Plaintiff has established a causal connection, the transfer was done for a legitimate penological reason, to build the population at Canaan.

We also note that this claim fails against defendants Bittenbender, Ranck, Clarkson, Feltman and Shepard. Plaintiff has not shown the personal involvement of any of these defendants, a necessity for the claim to proceed against them. *See Evancho*, *supra*, 423 F.3d at 353.[10]

      C.  *The Retaliation Claim for Being Assigned*
          *to the SHU Between July 5, 2005, and*
          *July 7, 2005*

In his complaint, Solan made a claim that he was placed in the SHU on July 3, 2005, as retaliation for complaining about the shower-stall incident after he returned to the prison from the hospital for treatment of his handball injury. We dismissed this claim because the placement had been made for security reasons. During Solan's escort to the hospital, a physician informed Solan of his next appointment.

---

may not be able to be put into such form.

    [10] This argument would not succeed against defendant Espinoza-Levi, his unit manager at the time. As Allenwood official Lavella stated, a transfer normally is approved by an inmate's unit manager. This would be sufficient to allow the claim to proceed against Espinosa-Levi even though we previously dismissed this claim against this defendant on the motion to dismiss.

Because this knowledge could have posed a threat to the safety and security of the institution, Solan was placed in the SHU until his operation, scheduled for July 7.  2005.

The court had thought that Plaintiff was making a separate claim that, while he was in the SHU awaiting his operation, his placement in a segregation cell from July 5, 2005, through July 7, 2005, with a mentally disturbed inmate who caused Plaintiff emotional suffering, was retaliatory for filing his grievance. The defendants have moved for summary judgment for any retaliation claim from July 5 to July 7 by making the same argument that had been successful for the July 3 SHU placement; Plaintiff was in the SHU for the safety and security of the institution.

In response, Plaintiff says he is not making a separate claim for the July 5 cell-mate situation, and concentrates on establishing that his placement in the SHU, certainly from July 7, 2005, through July 14, 2005, when he was placed in general population, was retaliatory, and a retaliatory attempt to take away the cell situation he had before he filed his grievance.

Based on the defendants' argument and Plaintiff's response, we will enter summary judgment for the defendants on any retaliation claim based on the specific SHU cell assignment from July 5 through July 7.

> D. *The Retaliation Claim for the Attempt to*
> *Place Plaintiff After His Return From an*
> *Operation on July 7 in a Six-Man Cell and*
> *Then When He Refused this Assignment, His*
> *Placement in Segregated Housing*

When Plaintiff came back to Allenwood on July 7 after his operation earlier in the day, prison personnel tried to place him in his original cell before his July 3 accident, but that two-man cell was occupied. They then tried to place Plaintiff in a six-man cell in the same unit, but he refused. For refusing the cell assignment, Plaintiff was given an incident report and placed in the SHU. He was released from the SHU on July 14, 2005, and assigned to a lower bunk in a six-man cell.

Plaintiff claims that the attempt to place him in a six-man cell and then his placement in the SHU was retaliatory for his filing a grievance about the shower-stall incident. Defendants argue that the actions of prison personnel were proper. They explain that when an inmate is expected to return the same day or the next day from a brief outside medical appointment, staff may on occasion hold the cell he had been occupying, but staff cannot be expected to hold a cell for an inmate held overnight in a hospital or who has been placed in the SHU.

Further, the policy for inmates who had been placed in the SHU, as Plaintiff was, is to return them to available cells in the same general-population unit they had previously been in,

usually a six-man cell. Moreover, during this particular time, numerous inmates were in the SHU because of the recent riot and needed to be placed back in general population, thereby decreasing the chance that Plaintiff could return to his original cell.[11] In regard to the SHU placement, Plaintiff was sent to the SHU because he had refused the six-man cell assignment, not for retaliatory motives. They also argue that there is no evidence that any of the defendants were personally involved in the cell assignments or SHU placement, noting that neither Ranck nor Espinoza-Levi was on duty the night of July 7.

In opposition, Plaintiff argues that cells have been saved for inmates who left the prison, submitting two penalty-of-perjury declarations from inmates who indicate that they, or another inmate, left Allenwood for medical treatment and returned a few days later to their original cells. He also writes novelistically at pages 11-15 of his opposition brief about how Espinoza-Levi and Ranck retaliated against him by arranging everything so that his original cell would not be available on the night of July 7, forcing him to refuse the six-man cell in his post-operative state, both defendants knowing that it would mean that he would in turn be placed in the SHU for refusing an order.

---

[11] We recognize that Plaintiff asserts his claim is really that he was not given a cell that was the equivalent of his original one, that his claim is not that he should have been returned to his original cell, but the defendants' argument applies equally to such a claim.

We agree with the defendants that this retaliation claim has no merit. That a few inmates were placed in their original cells after outside medical treatment does not mean that when Plaintiff was not returned to his original cell, it was retaliatory. The rest of Plaintiff's argument has no evidential support. We will therefore enter summary judgment in the defendants' favor on this claim.

E.   *The Claim that Defendant Feltman Made a False Investigation of the June 10 Shower-Stall Incident*

Plaintiff claims that defendant Feltman conducted a false investigation of the shower-stall incident. The defendants move for summary judgment on this claim because inmates have no constitutional right to a grievance procedure. We agree. Plaintiff is essentially complaining that Feltman did not act favorably on his grievance, but the failure of a prison official to do so is not itself a constitutional violation. *See Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *McGuire v. Forr*, No. 94-6884, 1996 WL 131130, at *1 (E.D. Pa. Mar. 21, 1996); *Flanagan v. Shively*, 783 F. Supp. 922, 931 (M.D. Pa. 1992).

Plaintiff has attempted to convert this claim to one that Feltman conducted a false investigation to deter Plaintiff from seeking redress for the shower-stall incident, but that was not the claim he set forth in his complaint. In any event, we

note that the case Plaintiff cites in support, *Nicholson v. Carroll*, 390 F. Supp. 2d 429, 436-37 (D. Del. 2005), cited in turn *Milhouse v. Carlson*, 652 F.2d 371, 374 93d Cir. 1981), a case that dealt with initiating disciplinary proceedings against an inmate for having filed civil-right suits against prison officials. Here, no disciplinary proceedings were involved; Feltman was only investigating the shower-stall incident.

    F.   *The Equal-Protection Claim for Being an Elderly, Peaceful Jewish Intellectual*

      Plaintiff claims that he was forceably removed from the shower and escorted naked to his cell because Plaintiff is an elderly, peaceful Jewish intellectual. The defendants move for summary judgment on this claim by arguing that there is no evidence that others similarly situated were treated differently. *See Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410, 423 (3d Cir. 2000). We agree and will enter summary judgment against Plaintiff on this claim.

IV.     *Conclusion*

Based on the foregoing, we will enter judgment against Plaintiff and in favor of all defendants on all claims.[12]


/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: November 16, 2007

---

[12] In his opposition brief, Plaintiff has expressed a desire to obtain an injunction against the BOP or its director to prevent future retaliatory acts no matter where Plaintiff is incarcerated. Neither the BOP nor its director is a party to this action and none of the allegations implicate the BOP's director, so this relief will not be considered.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID SOLAN,                          :
                                      :
          Plaintiff                   :
                                      :
          vs.                         :    CIVIL NO. 1:CV-06-0049
                                      :
                                      :
MS. V. RANCK, nee Hursh, et al.,:
                                      :
          Defendants                  :


*O R D E R*

AND NOW, this 16th day of November 2007, upon

consideration of Defendants' motion for summary judgment (doc.

116), it is ordered that:

          1.  The motion is granted in all
     respects.

          2.  The Clerk of Court shall enter
     judgment in favor of the defendants and
     against Plaintiff on the following claims:
     (a) the claim for Plaintiff's being removed
     from the shower and marched back to his cell
     while naked and shackled; (b) the equal-
     protection claim alleging that the forced
     removal from the shower and the naked escort
     were because Plaintiff is an elderly,
     peaceful Jewish intellectual; (c) the
     retaliation claim for Plaintiff's transfer
     to USP-Canaan, Waymart, Pennsylvania; (d)
     the retaliation claim for placement in a
     segregation cell from July 5, 2005, through
     July 7, 2005; (e) the retaliation claim for
     refusal to return Plaintiff to the cell he
     occupied before July 3; (f) the retaliation
     claim for the attempt to place Plaintiff on
     July 7 after his return from an operation in
     a six-man cell and then when he refused this
     assignment, his placement in segregated
     housing; and (g) the claim that defendant
     Feltman made a false investigation of the

June 10 shower-stall incident and was "likely" involved in the disappearance of the videotape covering the incident.

   3. The Clerk of Court shall close this file.

                                        /s/William W. Caldwell
                                        William W. Caldwell
                                        United States District Judge